## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 21 2020, 8:48 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT
J.S. (FATHER)

Harold E. Amstutz
Lafayette, Indiana

ATTORNEY FOR APPELLANT
M.S. (MOTHER)

Steven Knecht
Vonderheide & Knecht, P.C.
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of R.S., T.C., and E.C. (Minor Children), and

J.S. (Father) and M.S. (Mother),

*Appellants-Respondents,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

February 21, 2020

Court of Appeals Case No.
19A-JT-2081

Appeal from the Tippecanoe Superior Court

The Honorable Faith A. Graham, Judge

Trial Court Cause Nos.
79D03-1902-JT-31
79D03-1902-JT-32
79D03-1902-JT-33

**Mathias, Judge.**

[1] The Tippecanoe Superior Court issued orders terminating the parental rights of J.S. ("Father") and M.S. ("Mother") (collectively "the Parents") to their minor children R.S., T.C., and E.C. (collectively "the Children"). Mother appeals and presents one issue for our review, which we restate as whether the Indiana Department of Child Services ("DCS") presented evidence sufficient to prove that termination of her parental rights was in the best interests of the Children. Father presents three issues, which we restate as whether DCS presented sufficient evidence to prove that: (1) the conditions that led to the Children's removal would not be remedied; (2) continuation of the parent-child relationship posed a threat to the well-being of the Children; and (3) termination was in the Children's best interest. Concluding that the Parents' arguments are little more than a request that we reweigh the evidence, we affirm.

## Facts and Procedural History

[2] Mother is the biological mother of the three children at issue in this case: R.S., born in December 2013; T.C., born in December 2014; and E.C., born in June 2017. Father is the biological father of T.C. and E.C. Although not the biological father of R.S., Father signed a paternity affidavit stating that he was her father.

## A. The Informal Adjustment

When Mother gave birth to E.C. in June 2017, both tested positive for marijuana. During the subsequent DCS investigation, Mother admitted to using marijuana during the pregnancy. Mother claimed that she used marijuana as a substitute for the medication prescribed to treat bipolar disorder. Father admitted to knowing about Mother's drug use. The Parents and DCS entered into an Informal Adjustment.[1] Pursuant to the terms of the Informal Adjustment, the Parents agreed not to use drugs, submit to random drug screens, engage in home-based counseling, and complete substance abuse assessments. The Parents failed to complete substance abuse assessments or treatment, and Mother continued to use marijuana. The children missed medical appointments and appointments for developmental services.

On December 29, 2017, DCS received a report that the Parents' home was unsanitary and that the Children were naked in the home with Father, who is a convicted sex offender, their maternal grandfather, and another unidentified man. A DCS caseworker went to the home and found R.S. in her bedroom, naked, with the door wedged shut with a glove, preventing the child from leaving the room. In addition, the house was in disarray and littered with dirty

---

[1] As noted by DCS, a DCS intake officer may, with court approval, implement a program of informal adjustment if the officer has probable cause to believe that a child is in need of services. Ind. Code § 31-34-8-1. If a parent enters into such an agreement but fails to abide by the terms thereof, the court may find the parent in contempt. Ind. Code § 31-34-8-3.

clothes, rotting food, cigarette butts, and other trash on the floor. For some reason, the Children were not removed from the Parents' home at this time.

[5] A few days later, on January 3, 2018, Father reported to DCS that Mother was selling marijuana and engaging in prostitution from their home. When DCS investigated this report, the caseworker found Mother with one gram of marijuana, and the house was still filthy. R.S. was naked, which Mother attributed to her undergoing potty training at the time.[2] DCS removed the Children from Mother's house and, after one day being placed with Father, were placed in foster care. The children have been in foster care ever since and have lived with the same foster family since June 2018.

## B. CHINS Proceedings

[6] On January 4, 2018, DCS filed petitions alleging that R.S., T.C., and E.C. were children in need of services ("CHINS"). DCS amended its petitions on January 9, 2018. The trial court held a detention hearing on February 12, 2018, and approved placement of the Children in foster care. The court also ordered that the director of the Court Appointed Special Advocate ("CASA") program appoint a specific CASA for the Children. The trial court held CHINS fact-finding hearings on May 2, May 14, and May 17, 2018. The trial court issued its CHINS dispositional orders on June 6, 2018.

---

[2] R.S. would have been over four years old at this time.

[7]     The CHINS parental participation orders, entered on June 29, 2018, required the Parents to: attend all court hearings, case conferences, visitations, and appointments as scheduled; sign and update release of information for ordered services; contact DCS at least twice per month in person, by email, or by telephone; notify DCS of changes in their address, household members, telephone number, or employment within five days of the change; obtain and maintain safe housing suitable for children with appropriate bedding, functional utilities, and adequate food; not allow anyone to reside in their home without DCS approval; not associate with anyone who is a party to any child welfare or criminal case unless approved in advance by DCS; not have any child in their care unless approved in advance by DCS; allow DCS, CASA, or service providers to make announced and unannounced visits to their home; not consume or possess, nor allow anyone else in their home to consume or possess, any illicit drugs; inform DCS of any drug prescribed and take it exactly as prescribed; not consume or possess alcohol; submit to random drug screens upon request of DCS, CASA, or the court; obtain and maintain legal and stable source of income, including public assistance adequate to support their needs; pay any child support or reimbursement as ordered; enroll in any ordered services and schedule a first appointment within ten days of the order or referral; follow all recommendations from any assessments or evaluations; follow all agreements with DCS, CASA, and other service providers; follow all safety plans; provide documentation regarding compliance with court orders; be honest with DCS, CASA, service providers, the court, and other parties in the case; and obey the law. Ex. Vol. 1, pp. 133–34.

[8] The trial court also ordered Mother complete intensive outpatient therapy, complete a psychological assessment and follow all recommendations, and participate in home-based case management. The court ordered Father to participate in a medical evaluation and follow all recommendations. The Parents' participation in these services was sporadic, due to their frequent incarceration and Mother's continued drug use.

*C. Father*

[9] Father was convicted of child molestation in 1997. The victim was his then-girlfriend's twelve-year-old daughter. Father was incarcerated on this conviction from 1997 to 2001, when he was released on parole. He was soon re-incarcerated for a parole violation and was released in 2003. Father was convicted for failing to register as a sex offender in 2013 and was placed on community corrections and probation. Mother knew Father was a convicted sex offender when she met him but continued her relationship despite this.

[10] Father also had voluntarily terminated his rights to one of his children with another woman in 2008. Father was in jail from March 21, 2018 through August 2018 and was in jail again from February 7 through March 25, 2019. Both of these incarcerations were for probation violations due to failure to pay child support for one of his older children. Father was never fully employed. He claimed to have certain heart problems that made full-time employment difficult to find.

[11]     Father's participation in services was sporadic. He, along with Mother, initially attended supervised visitation, and the Parents seemed affectionate toward the Children. After one visit, however, R.S. claimed that Father had touched her inappropriately, but the visitation facilitator did not witness this touching. Ultimately, both Parents attended only four of the scheduled visitations with the Children. In January 2019, Father called the visitation facilitators to tell them that he and Mother would no longer be visiting the Children at the same time. But Father did not attend any visitations after that, and his visitation was cancelled in March 2019.

[12]     Father's participation in home-based case management ("HBCM") fared little better. Out of six scheduled sessions, Father attended only two. After Father failed to appear for two sessions without calling, he was discharged from HBCM. The DCS Family Case Manager ("FCM") referred both Parents to parenting education classes in January 2019, but neither attended. Father did complete a substance abuse assessment and was recommended to substance abuse therapy. But he was discharged from the therapy for failure to attend.

*D. Mother*

[13]     Mother too was incarcerated during portions of the CHINS case. She was on probation as a result of a misdemeanor theft conviction but violated the terms of her probation by testing positive for methamphetamine and was in jail as a result at the time of the termination hearing.

[14]   Mother struggles with substance abuse. She admitted to using marijuana since she was twelve years old. She underwent a substance abuse assessment in November 2018 and was diagnosed with methamphetamine use disorder. She was referred to intensive outpatient therapy but was discharged in February 2019 due to non-compliance. Mother stated that she was clean during a short period in September 2018, when she was incarcerated. She admitted that she relapsed to using methamphetamine in January 2019 and stated that she smokes methamphetamine and marijuana at the same time. When she was rejected by the first inpatient program, she failed to seek out a second program because she was "too high." Tr. p. 97.

[15]   Mother was also referred for a psychological assessment and therapy. She scheduled one appointment but later cancelled it. She also failed to attend the parenting education and couples counseling that she was referred to. She was discharged from HBCM during the Informal Adjustment and was referred to HBCM again in September 2018. However, she cancelled the scheduled appointments and was again terminated from these services. Mother admitted that she did not accept services from January 2018 until September 2018.

[16]   Mother also attended only four of the six scheduled visitations with the Children, though she acted affectionately toward the Children when she did attend. She was discharged from visitation in January 2019 after she got "nasty" with the visitation facilitator. Tr. p. 46. The FCM then referred Mother to a new visitation facilitator. However, she was discharged by this facilitator in February 2019 after she tested positive for methamphetamine.

*E.  The Children*

While in foster care, R.S. and T.C. were treated by home-based mental health therapist Samantha Dagenais ("Dagenais"). When Deganais first began to treat R.S., the child had issues with aggression, bed wetting, nightmares, and physical boundaries. Specifically, she would fondle herself or allow others to fondle her. Tr. p. 26. All of these behaviors indicated that R.S. had been the victim of physical and/or sexual abuse. By the time of the termination hearing, R.S.'s troubling behaviors had substantially abated. T.C. also had issues with aggression and physical boundaries, but his behavior also improved over time as a result of therapy. Both R.S.'s and T.C.'s troubling behaviors grew worse after their visitations with the Parents. Accordingly, Dagenais recommended the visitation with the Parents end. Dagenais opined that the continuation of the relationship between the Parents and the Children was detrimental to the Children. She based her opinion on the progress the Children had made and on the fact that, when the Children were informed that visitations with the Parents might begin again, they regressed in their behavior.

The FCM explained that R.S. and T.C. still needed extensive services. Due to E.C.'s young age, she did not need the same services. T.C. was in occupational therapy, speech therapy, and play therapy for trauma. R.S. was also in speech therapy and play therapy. The FCM stated that the Children made "huge improvements" since being placed in foster care. Tr. p. 108.

The permanency plan for the Children was adoption, and the Children were in pre-adoptive foster care. The children were doing well in foster care and were

bonded to each other and the foster parents. The foster parents were willing to adopt all three children and desired to do so.

*F. Termination Proceedings*

On February 25, 2019, DCS filed petitions to terminate the Parents' parental rights to the Children. The trial court held a hearing on the petitions on May 23, 2019. And the court issued findings of fact and conclusions of law terminating the Parents' parental rights on August 30, 2019. Both Parents now appeal.

# Termination of Parental Rights

Indiana Code section 31-35-2-4(b)(2) provides that a petition to terminate parental rights must allege:

> (B) that one (1) of the following is true:
>
> > (i)   There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii)  There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> >
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

[22]     DCS must prove each element by clear and convincing evidence. Ind. Code §
31-37-14-2; *In re G.Y.*, 904 N.E.2d 1257, 1260 (Ind. 2009). Because Indiana
Code section 4(b)(2)(B) is written in the disjunctive, the trial court is required to
find that only one prong of subsection 4(b)(2)(B) has been established by clear
and convincing evidence. *In re A.K.*, 924 N.E.2d 212, 220 (Ind. Ct. App. 2010).

[23]     Clear and convincing evidence need not establish that the continued custody of
the parent is wholly inadequate for the child's very survival. *Bester v. Lake Cty.
Off. of Family and Children*, 839 N.E.2d 143, 148 (Ind. 2005). It is instead
sufficient to show by clear and convincing evidence that the child's emotional
and physical development are put at risk by the parent's custody. *Id.* If the court
finds the allegations in a petition are true, the court shall terminate the parent-
child relationship. Ind. Code § 31-35-2-8(a).

[24]     The purpose of terminating parental rights is not to punish parents but instead
to protect their children. *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004).
Although parental rights have a constitutional dimension, the law allows for
their termination when the parties are unable or unwilling to meet their
responsibilities as parents. *Id.* Indeed, parental interests must be subordinated to
the child's interests in determining the proper disposition of a petition to
terminate parental rights. *In re G.Y.*, 904 N.E.2d at 1259.

# Standard of Review

[25] We have long had a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). Thus, on appeal, we neither reweigh the evidence nor assess witness credibility. *Id.* We consider only the evidence and reasonable inferences favorable to the trial court's judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* Clear error is that which leaves us with a definite and firm conviction that a mistake has been made. *J.M. v. Marion Cty. Off. of Family and Children*, 802 N.E.2d 40, 44 (Ind. Ct. App. 2004), *trans. denied*.

[26] When a parent does not challenge the trial court's factual findings as being clearly erroneous, we accept those findings as true and determine only whether these unchallenged findings are sufficient to support the judgment. *In re A.M.*, 121 N.E.3d 556, 562 (Ind. Ct. App. 2019), *trans. denied*; *see also T.B. v. Ind. Dep't of Child Servs.*, 971 N.E.2d 104, 110 (Ind. Ct. App. 2012) (holding that when the trial court's unchallenged findings support termination, there is no error), *trans. denied*.

## I. Father's Arguments

[27] Father argues that DCS failed to prove by clear and convincing evidence that: (1) the conditions that led to the Children's removal would not be remedied, (2)

continuation of the parent-child relationship posed a threat to the well-being of the Children, and (3) termination was in the Children's best interest.[3]

[28] Father first claims that the trial court clearly erred by concluding that there was a reasonable probability that the conditions that resulted in the Children's removal from his care, or the reasons for their continued placement outside his home, would not be remedied. When deciding whether there is a reasonable probability that the conditions resulting in a child's removal or continued placement outside of a parent's care will not be remedied, the trial court must determine a parent's fitness to care for the child at the time of the termination hearing while also taking into consideration evidence of changed circumstances. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156–57 (Ind. Ct. App. 2013), *trans. denied*.

[29] Father's argument on this issue does not directly address the question of whether the conditions that led to the Children's removal have been remedied. Instead, he argues that the trial court focused only on his prior behavior, not his current behavior. But a trial court may disregard efforts made only shortly before termination and give more weight to a parent's history of conduct prior to those efforts. *In re K.T.K.*, 989 N.E.2d 1225, 1234 (Ind. 2013). And we have long held that, given the nature of the inquiry in a termination case, a parent's

---

[3] Father also briefly argues that several of the trial court's findings were "incomplete and therefore misleading and non-supportive of the subsequent conclusions." Father's Br. at 16. Father fails to explain precisely how these findings were incomplete or misleading, and we therefore do not consider this argument further.

character is an integral factor in addressing a parent's fitness and determining the child's best interests. *In re D.G.*, 702 N.E.2d 777, 780 (Ind. Ct. App. 1998). We therefore cannot fault the trial court for noting the entire history of Father's behavior, including his prior conviction for child molesting and his more recent conviction for failing to register as a sex offender.

[30] Father also complains that the trial court "fast tracked" this case, noting that the CHINS dispositional order was issued on June 6, 2018, and the petition to terminate his parental rights was filed on February 25, 2019. This, however, overlooks the long history of the case prior to the dispositional order. This case began in June 2017 with the Informal Adjustment following the birth of E.C. When the Informal Adjustment did not successfully address the problems, DCS filed CHINS petitions on January 4, 2018. We therefore reject Father's claim that this case was "fast tracked."

[31] To the extent that Father claims that the trial court clearly erred in determining that the conditions that led the Children's removal would not be remedied, we disagree. The conditions that led to the Children's removal from the Parents' care included Mother's continued drug use and both Parents' neglect of the Children. Father admitted that he was unemployed and had a sporadic employment history. He did not have stable housing. He has been in and out of jail throughout the pendency of the CHINS case. He failed to complete most of the offered services and was discharged from both HBCM and substance abuse therapy. Father does not deny any of this but claims he simply needs more time. Given Father's failure to take advantage of the services offered to him, we

can see no reason why the trial court should have given him additional time to correct the reasons that led to the Children's removal from his care.

[32] Father also contends that the trial court clearly erred by determining that the continuation of the parent-child relationship posed a threat to the Children's well-being. As noted above, however, the trial court was required to find only that one prong of subsection 4(b)(2)(B) had been established. *See In re A.K.*, 924 N.E.2d at 220. Because we have concluded that DCS proved that there was a reasonable probability that the conditions which resulted in the Children's removal would not be remedied, we need not address Father's arguments directed at the "threat" prong of section 4(b)(2)(B). *See id.*[4]

## II. Mother and Father's Joint Argument

[33] Both Parents argue that the trial court clearly erred in determining that termination of their parental rights is in the best interests of the Children. In determining what is in the best interests of a child, the trial court must look beyond the factors identified by the DCS to the totality of the evidence. *A.D.S.,*

---

[4] Even if we considered Father's argument regarding the continuation of the parent-child relationship, he would not prevail. When reviewing the question of whether continuation of the parent-child relationship poses a threat to the child's well-being, termination is proper when the evidence shows that the emotional and physical development of a child is threatened. *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 94 (Ind. Ct. App. 2014). A trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth is permanently impaired. *Castro v. State. Off. of Family and Children*, 842 N.E.2d 367, 372 (Ind. Ct. App. 2006), *trans. denied*. Here, the evidence shows that, when they were first placed in foster care, the two older children had serious emotional and behavioral issues, including bed-wetting and inappropriate touching. These behaviors worsened when the Children would visit the Parents and would abate when the visitations ended. The Children's therapist testified that continuing the parent-child relationship would be detrimental to the Children. Under these facts and circumstances, the trial court did not clearly err in determining that continuing the parent-child relationship constituted a threat to the Children's well-being.

987 N.E.2d at 1158. In so doing, the court must subordinate the interests of the parent to those of the children. *Id.* The court need not wait until the children are irreversibly harmed before terminating the parent-child relationship. *Id.* Moreover, a recommendation by both the case manager or child advocate to terminate parental rights is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *Id.* at 1158–59. Permanency is a central consideration in determining the best interests of a child. *Id.* at 1159. "'A parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that termination of the parent-child relationship is in the child's best interests.'" *In re A.K.*, 924 N.E.2d at 221 (quoting *Castro v. State Off. of Family and Children*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), *trans. denied*).

[34] Here, the Children's therapist, the FCM, and the CASA all testified that termination was in the Children's best interests. The therapist Dagenais testified that it would be best if the Children remained in foster care, as they were bonded with their foster parents and with each other. The FCM testified that termination was in the Children's best interests because, based on the Parents' pattern of behavior, "if [the Children] were returned . . . they would be exposed to substance abuse and other illegal activity and instability in their lives." Tr. p. 108. The CASA similarly testified that termination was in the Children's best interests, noting that the case had been pending for over 500 days, the Parents failed to complete services, Mother relapsed in her drug use, and the Parents lacked stable housing and employment. Indeed, the record reveals that Father

has been repeatedly incarcerated during this case and failed to take any steps to provide a stable home for the Children. Mother failed to address her substance abuse problems. For all these reasons, the trial court did not clearly err in determining that termination of the Parents' parental rights was in the Children's best interests.

## Conclusion

[35] The trial court did not clearly err in determining that DCS presented clear and convincing evidence sufficient to support the termination of the Parents' parental rights. We therefore affirm the judgment of the trial court.

[36] Affirmed.

Kirsch, J., and Bailey, J., concur.